You may proceed, Counsel. Good morning, Your Honors. May it please the Court, my name is Joseph DeAncali. I represent the petitioner. If I could, I'd like to reserve five minutes. Okay, I'll try to help you. Your Honors, this case presents a number of interesting issues, but at bottom it's a pretty traditional administrative law question, and I hesitate to add this. It also involves burden of proof to some extent, and yet a different burden of proof than we've been talking about, and that is whether the government can use a novel definition of an apparently unambiguous regulatory term, resident abuse, to support the imposition of a series of what the Eighth Circuit has called quasi-criminal sanctions. We think not. We think the Board's expansive definition of the term abuse to sustain a sanction in this case was arbitrary and capricious, and it disregarded the record evidence regarding the context of the interaction involved. If you look at the transcript of the hearing, it's pretty clear that the surveyors, the inspectors, concluded that touching a resident plus injury equals abuse, without consideration of intent, context, or anything else. And that's what comes through in the Board's decision that we're appealing. Just a couple of excerpts, I think, make that pretty clear. The Board said the ALJ, I'm quoting, considered Ridgecrest's argument about the resident's history and the circumstances of the incident, and concluded they did not justify the CNA's use of force against the resident. We agree. We concluded that the CNA's use of force against the resident here was defined in federal law and, indeed, in the facility policies as abuse. The Eighth's subjective intent does not remove the inappropriate use of force from these definitions of abuse. Rather, the force applied here was a coercive response to resident one's resistant behavior. Counsel, on page 19 of the Board's decision, actually the ER side is 19, what the Board actually said is that abuse can encompass deliberate acts not intended to inflict injury, right? And it seems to me the problem here is that I think there's certainly a couple But isn't, here's what I want you to respond to. I think what the Board actually said, that abuse can occur without intent to injure. Right. But just because there's been an injury doesn't mean there was abuse. In this case, I think what the Board was really sustaining is that, I think what the Board was really sustaining is that this particular maneuver was used in an inappropriate circumstance because they could have just waited out the resident. Right. Even if you read the Board's fairly expansive language, the language I read, which is on page 7 of the Board's decision, page 9 of the convention. I grant you there are sound bites that are concerning, but overall I think that's what this opinion is saying. So even if you read the Board's language to say, in this case the use of force was abusive, it's still problematic, for two reasons. One is it's inconsistent with the regulatory language, and two is it doesn't take the context into account. Well, wait a minute. So the regulatory language I'll give you because the regulatory language talks about an intent to injure. Well, it says willful. Yep. Willful intent. Willful infliction of injury. Now, what the Board has held on many times, and this decision is not entirely crystal clear about this because it sort of addresses in shorthand what the Board has held in the past. They say that willful means deliberate as opposed to accidental. So they say it does not require any kind of intent at all. That's where they get this discussion that the AIDS subjective intent does not remove, et cetera, et cetera. And that's our problem here, and that is the AIDS subjective intent in these circumstances has to be taken into account in determining whether this particular interaction was abusive. You can't read out the word willful, whether you would take that to include intent or not. You can't read that out of the regulatory definition for the purpose of being able to characterize an intervention as something that would trigger imposition of sanctions. But, counsel, I agree with you. This is an incredibly broad definition of abuse. But we run into this in the criminal arena in determining willfulness to mean deliberate physical action. And it doesn't necessarily have to involve an evil intent. It just has to involve a conscious decision to employ physical action. In this case, the decision to employ the control technique of, I guess, what, bending the fingers back on the hand in order to get... And I think the agency was critical of the use of that particular control technique in getting the resident to release his grip on the doors. Right. Being critical of a technique, though, is different than saying it falls within a regulatory definition of abuse. Well, but you've got two problems. One is that the board found that the use of the technique didn't comply with the facility's own policy, right? Not in these circumstances it didn't, right? And I don't think you respond to that at all in your briefing. Well, I think we do, because all of the witnesses who testified said that it did, and the expert that's here... No, that's not correct. The record's pretty clear on that point, because that was a technique used as a self-defense technique. And under these circumstances, really, in context, the problem was there wasn't any reason that they couldn't just wait out this resident. Eventually he was going to let go of the doorknobs, right? Well, there was. Even the board held that the ALJ's finding to that effect was not supported by the evidence. They were afraid that he was going to go back into the shower room and hurt himself. They couldn't withdraw from the situation, or they were afraid he was adjacent to these cubbies that they were afraid he was going to reach into. As a matter of fact, the aid had already... Well, he's not going to reach into them while he's got his hands on the doorknobs. But anyway, can you go back to... What's your best argument that this was... Excuse me. The use of this technique under these circumstances was compliant with your own facility's policies? The best argument to that is that... is twofold. One is, nobody disputes that this resident was an appropriate admission to this facility even though he's not a typical nursing facility resident. So, secondly, nobody disputes that the petitioner trains its staff to deal with violent behaviors by this kind of resident for a good reason. The corollary to that is, when the incidents happen, they happen quickly, require the staff to make judgments in real time, quickly, about how to respond to the incidents to de-escalate them. Again, remember, this aid was in the shower with the resident for the entire purpose of controlling his behavior. So once he gets pinned behind him and he testifies, he then loses the ability to control his behavior. He testified that he escaped really quickly from that first part. At the same time, he's pressing down. He's pressing down, trying to escape. So when he loses the ability to control the resident's behavior by the way he's positioned, the resident's pinning him, he's now behind the resident, he testifies that that's an emergency. That requires him to make a judgment what sort of intervention is necessary. Our bottom line is this is not the sort of situation that we want surveyors or inspectors or ALJs or anybody else coming back after the fact and second-guessing the judgment that the staff person in those circumstances made. I understand that. If you win on that point, don't you still have a problem with the failure to report the allegation of abuse? And to timely investigate. And to investigate and then to train that this is an appropriate circumstance to use that technique. What about all of those findings? This is an ongoing issue. There are gazillions of cases bubbling up through the process that address this issue. And the facility's position is pretty straightforward, and that is we have to make an initial determination when facts are reported to us, what is the nature of the incident, what is the nature of the interaction. If it could, in our view, possibly constitute abuse, as defined either in regulation or in our policies, then we have certain obligations. We have to suspend the staff person. We have to do a formal investigation. All right, counsel, and you're getting ready to tell me what you did in your brief, right, which is that because it was an abuse, you didn't have to report it. And, of course, that's very circular. So what's your best response to that? No, I'm not getting ready to tell you that. Well, that's what you did in your brief. No, what I said was when staff makes an initial determination that the facts could not constitute abuse because they've identified as something else. Counsel, forgive me for interrupting, but here's the problem. There may be a case where that fits, but in this case there was a broken bone. There was a finger that had to get surgically repaired. And so it's a very tough argument for you to make in this case, that there wasn't any possibility of allegation of abuse that needed to be investigated or reported. In this case, that's a very tough sell. Well, I disagree with that. Okay, why is that? Because they determined quickly that it was an accident. And I think they properly determined that there is a distinction between injuries caused by accident and injuries caused by abuse. They didn't say we don't have to investigate it at all. They said we have to investigate it enough to figure out what it is. And if it is abuse, then we have further hoops to jump through. I mean, we go back to the definition of abuse. If the control technique was willfully employed, and I don't think there's any question that it produced a broken finger, then how can you say that was an accident? You can say the aide didn't intend to break his finger when he employed the control technique, but he did. And that was willful. In a health care setting, I mean, there are plenty of adverse outcomes that are accidental, up to and including fractures. I mean, somebody can roll out of a bed while having care provided. No question about that. No question about that. But here we have actual physical contact between the aide and the patient that produces an injury. It's hard for me to see how the facility could have deemed that to be an accident. Which brings me to page 20. Remember, there's some sound bites, I think, that are really concerning about the burden of proof. But at page 20, what the Board is saying, none of these materials establish that Ridgecrest Management had recognized that aide had been acting under the mistaken understanding that abuse cannot occur unless the actor intends abuse or injury. Again, that requires you to accept a definition of abuse that does not include any element of intent. It's just the flip side. It's just the flip, counsel. It's just the flip. What the Board is saying, it could occur, it could be the case that abuse could occur even if somebody didn't intend to be abusive. In other words, you seem to be arguing that no matter how severe the harm was, in a different case perhaps, not a broken finger, but a much more serious circumstance, that if the individual responsible didn't have the requisite level intent, that that couldn't be abuse. I think that's what you're arguing. No, that's not what we're arguing. What we're arguing is that the application of the definition, which then triggers the obligation to do the investigation, the full investigation. The allegation of abuse. Right. It has to take into effect context. And so in this situation, the facility knew that there were likely to be incidents that would require physical intervention. They obviously couldn't spell out exactly what every one of them are. And they contemplated that the physical intervention could be fairly significant. Again, there's no dispute that given the nature of the behaviors by this population, it could be mentioned. So in that context, and I think the administrator made this point exactly. She was criticized for saying, well, you thought that they kept him safe, but he was actually injured. She said, no, they kept him safe in the context they were in, which is that he could have been seriously injured or seriously injured somebody else, again, given the location where it happened, other residents around and so forth. And in that context, the fact that he suffered a fractured finger is not significant enough for us to cause us to consider this to be abuse. If the factual circumstances were, in this hypothetical I'm about to give you, were all the same, but instead of breaking a finger, the patient broke a shoulder, would the reporting and investigation obligations under your theory be any different? I can't answer that because, again, we're taking into context what the administrator knew when she made her determination. If, for example, he broke his shoulder by, you know, butting it against one of the other staff people who was trying to intervene. The staff member was trying to get his hand off the door knob, and the patient fell down and broke his shoulder. My guess is, Your Honor, and I'll be honest with you, that the staff probably would have treated that one differently. And done what? What if the attendant said, oh, my goodness, I didn't mean to do anything? Would you think that you wouldn't need to report and investigate that? I'm fairly confident, again, because in this sort of facility, this sort of thing does happen. So I'm fairly confident that given all the facts and circumstances, even if this resident had suffered a significant injury, broken leg, broken shoulder, whatever, that at the end of the day the facility would have concluded that it wasn't abusive under the circumstances. Right, but it's not about the end of the day. I think you may have a very strong argument about this not having been abusive, but I don't know how it didn't trigger a duty to investigate or report. That's my problem with your position, counsel. Right. There is some obligation, and this case does pose the question, what is that obligation? There is some obligation for the administrator to do some level of inquiry and some level of decision making about the nature of an incident before that other series of reporting, suspension, investigating, and so forth. And it has to be done within five days. Well, correct. There's various hoops that have to be jumped through. So it's concerning that your view is that a broken bone doesn't trigger that threshold that we need to report and investigate. That's very concerning. You have to report abuse or injuries of unknown. But now you're back to the circular part where if you're going to decide internally that a broken bone is not abusive because it wasn't intended, therefore it doesn't need to be investigated, really? Well, somebody has to make that initial determination. The regulation doesn't say, nor does CMS say, that any time something unusual happens you have to treat it as abuse. So somebody has to make the initial determination. Right. And so my question, and we keep coming back to this, but I haven't heard the answer. My question is, in this case, given that there was a broken bone that needed surgical repair, in this case, why doesn't that trigger the duty to report and investigate? Because under the circumstances, we think the administrator's conclusion that this was a behavioral incident, that was responded to appropriately, and that the response kept the resident from more serious injury was reasonable under the circumstances. I think that's our answer. Did you want to go to the last issue? Could I just ask about the plot issue? Yeah. The plot issue, counsel? Well, you decided. At the time you all briefed, that was still cooking, so. Correct, correct. It doesn't really determine the outcome of the case, but I think the plot issue fits this on all fours because you have exactly the same thing. You have a deficiency that could have supported at least part of the sanctions that the government or that the board said we don't, or the ALJ and the board said we don't have to address. Now, in the interim, the plot was decided, which said, yes, you do. Did you have to address it or dismiss it, right? You have to address it or dismiss it. And so is that where this, factually, is that where this resides at this point? Has it been dismissed? No. The government hasn't taken any further action since this case has been appealed to. Thank you. All right. Let's hear from the government. Thank you. Thank you. May it please the Court. My name is Matthew Drugmiller, attorney for the respondent secretary. Under the secretary's longstanding interpretation of the relevant regulation, abuse does not require the specific intent to cause harm, only that the action taken be deliberate. Here, a resident had mobilized himself in the shower room area by grabbing onto a door handle with each hand. One of Petitioner's staff admitted that he used a self-defense technique to try and force the resident to release his grip on the door handle. In doing so, he broke the resident's finger. There's no dispute that he applied the technique deliberately. Now, Petitioner contends that the resident's injury was an accident that occurred while staff were trying to protect the resident from hurting himself or others. But the secretary's position is it doesn't matter, right? In other words, if willful, deliberate, physical action constitutes abuse, then as soon as an aide lays a hand on a patient, the aide has abused the patient. I mean, it's a very broad definition of a term that I thought I understood before I started reading this regulation and the board's cases interpreting. I mean, it's broad to the extent that it's true it does not require the specific intent. It's a strict liability offense. If there's physical contact and harm occurs to the patient, it's de facto abuse. No, I don't think that it rises to the level of a strict liability standard. And I think you do have to look at the context in which the injury occurred. Suppose the incident yesterday was a finger got bruised and was swollen, got bruised, but it wasn't broken. I think we're in the same. A duty to report? I think so, yes, because based on the context in which it occurred, this was not an emergency situation in which the staff member had to make a split-second decision about what to do. This event unfolded over the course of several minutes, and at the time the CNA made the decision to apply the self-defense technique to try and get the resident's hand off the door handle, there were three other CNAs, certified nursing assistants, present. Now, petitioner's contention has been all along that we were afraid that this resident was going to reach into a cubby and grab a shower item, like shampoo, soap, whatever, and try and ingest it or otherwise harm himself by something he could pull from a cubby. So they had to try and physically remove him from that area. If the CNA had just taken the hand and dragged it off the doorknob, no bruise, no fracture, was that abuse? If there were no injury whatsoever, then I don't think we would have known about it. So if you did know about it, if there's someone standing there looking at it, is that abuse? So you don't need an injury in order for there to be a violation of the abuse regulation here. I realize that. I was asking you a hypothetical. Right. I mean, under the hypothetical, I don't think you would have abuse on the facts set out in your hypothetical. Why not? Why wouldn't you have abuse and why wouldn't you have possible abuse? Where there's no injury? Yeah. Well, because under these facts, you don't have a physical injury. So it's the government's position that some sort of physical injury is required for there to be an abuse? No. Wait a minute, wait a minute, wait a minute. The definition is abuse means willful infliction of injury, unreasonable confinement or intimidation, right? So nobody's talking about punishment resulting physical harm, pain or mental anguish. We're talking about willful infliction of injury. Or intimidation. Right, which is why the definition... Is that your theory, that this was intimidation or confinement? No. I thought your theory was that this was willful infliction of injury. Correct. So how can you say that no injury is required to establish abuse? That doesn't make sense. Not under the portion of the definition of abuse that's relevant here, which is the willful inflection of abuse. No, this is willful inflection of injury. This is important because maybe I'm missing the boat here. I'm looking at this definition as abuse means the willful inflection of injury. Are we looking at the wrong regulation? No, but it goes on, and I believe you actually read part of this. Willful inflection of injury, unreasonable confinement, intimidation or punishment with resulting physical harm, pain or mental anguish. Right. So you can have abuse where there's mental anguish. There's no physical injury there. No. Under this definition, as I read it, it would have to be punishment resulting in mental anguish. I guess it depends on which clauses modify which nouns. And here, the portion of the definition that's relevant to this case under these facts is the willful inflection of injury. So it does, on that theory, an injury is required. That's why we started about two minutes ago. Right. Judge Parker asked whether injury was required. You're not going to give away the case by saying yes to our question. In this case, it does require an injury because that was the theory on which the violation was predicated. Yes, under these facts, yes. All right. Let me ask you a different question. There was evidence in the record that during the scuffle, altercation, resistance, whatever you want to call it, that one of the CNAs was struck in the breast. So would that trigger a right to self-defense? Certainly, I think staff have a right to defend themselves if they're being attacked. However, here, the self-defense technique employed was not done for that reason. It was not done by the resident, by the staff member who was apparently. But the testimony was that it occurred contemporaneously with all of the other conduct. I mean, we've got not only that he's grabbing a hold of the door frames, but he's also reaching into what they call the cubbies, which I assume are open storage places where other residents keep their shaving kits and toiletries and so on. And he was trying to grab things out of there, which the CNA testified he was concerned about because he'd previously tried to put things in his mouth and perhaps to drown himself in the shower, basically take steps to harm himself. Isn't that all part of the context in which this alleged abuse occurred? Well, the resident only struck out at staff members after they began to try and remove his hands from the door handles. So I don't think it's fair to categorize it as all happening in the split second. You stood up there and you told us at the beginning that context is considered here in determining abuse, but yet you seem to want to do what we see all the time in other cases. You want to break the action down into thin little pie slices and view them in isolation. That seems inconsistent with viewing things in context. As I understood your original question, was the CNA that was struck entitled to defend herself? And the answer to that was yes, but here that's not why the CNA who injured the resident employed the technique that he did. But the CNA testified that that was part of, I'll call it, the outburst of the patient at the time. I mean, the problem I'm having with the application of this broad definition of abuse is you've got a very difficult patient population here. You've got someone who's seriously mentally ill, who's bipolar and schizophrenic, who's assigned to a locked behavioral unit and who has a history of acting out. And yet you want to say that every time an aide touches one of these patients when they're acting out and some injury results, that is by definition abuse under your regulations. I don't know how you operate a nursing home and care for these kinds of patients under those kinds of rules. It is not the Secretary's position that mere touching plus injury equals abuse. But if you look at the context in which the injury arose, the facility's premise is, well, we had to try and force him out of the room so he couldn't grab shower items and hurt himself. The Secretary found that, one, physical intervention was not necessary in this context. Now, just because the resident has a long history of cognitive and mental issues, and granted, he certainly does, does not give facilities sort of a blank check to employ whatever techniques they want and then after the fact say, well, he's a difficult resident, so we just did what we had to do. And at the time that the CNA made the decision to employ the technique, there were four people there. So the Secretary found that, look, you didn't, in that situation you have four people there to prevent the resident from trying to grab items out of the cubby if he actually lets go with one hand and reaches into that. So the facility's mistake was having one person grab him instead of four? No. The mistake was to try and coercively remove him from a situation that didn't call for it. If the facility said, look, we don't want to do it. So it's a misapplication of this maneuver. Yes. They use it in the wrong circumstance. That's not strict liability. That's a much more nuanced judgment call. That's a much more nuanced judgment call than the notion that just because someone's You do look at context. But here, you look at there were four people there who could have acted to prevent the resident by deflecting his hands or simply standing between him and the cubbies he was trying to reach into purportedly if he actually let go with one hand and reached into them. And one of the problems, and there was testimony on this, is one risk you run by physically intervening in a situation is that you actually escalate the situation. And that's, in fact, what happened here. It was after staff began to try and forcibly remove the resident's hands that he struck out. And I think it is relevant that, you know, as a result of physically intervening, they did break the resident's finger. Counsel, could I get you to focus on the other part? Your time's ticking. So I think I understand your argument on why this was or was not abused, at least in the context of this case, I do. And then I think we talked about the allegation that there were separate violations for failure to report and investigate and then train, basically adopt new policies. And that was all true as, I think, December, December 5, 6. But by the time you get to February, what the agency found is these violations were ongoing. And yet, at that point, they had reported and they had investigated. And so it's not clear to me why there's a finding that they continued to be out of compliance all the way through to April 5. Because they... Are they entitled to some kind of abatement or something? That was a three-part violation that was alleged to be ongoing through till April 5, and it wasn't. Between February and April, they had certainly reported and certainly investigated. Right. The problem was is they were still operating under the misconception that you need a specific intent to harm the resident. I get that part. That's the one they weren't in compliance with. They still were operating under the misunderstanding that you had to have an intent to harm. And if you didn't, there couldn't be an abuse. But my question is really a little more technical than that. Basically, it's a three-parter, right, violation. And they were in compliance with two parts. They had, by April 5, they had reported and they had investigated. So is it the law that the agency is still going to levy the same per-day violation all the way between April and, sorry, between February and April, even though they were partially in compliance during that time? They have to return to substantial compliance. On all three prongs? That's my point. Right. The finding from the initial survey, you know, you've got the initial noncompliance. And the presumption is that continues, and this is per the regulations, that continues until the facility is determined to return to substantial compliance. That's either done by typically like a revisit survey, or in limited instances, the facility can allege that it has returned to substantial compliance. Yes, but counsel, here's the deal. It's substantial compliance with what? The duty to report? They've done that. The duty to investigate? They were in substantial compliance with that also. What they weren't in substantial compliance with is recognition that they were using the wrong definition and or perhaps they had the wrong, they hadn't trained on the correct use of that technique. Does that still justify an ongoing finding that they were out of compliance? Yes, it does, because the facility's obligation is to be in substantial compliance with. . . Can you just give me the site for that? That off the top of my head, I'm sorry. Okay. I just want to give you a chance to respond to this other allegation about plot at the time of, maybe that's shorthand enough for you to know what I want you to talk about. There's another allegation of violation, and I think it hasn't been either dismissed or pursued. And after plot, that's not possible, right? Right. Plot is the law of the Ninth Circuit, and so there is an unreviewed deficiency that. . . Well, what's the government's position on that? About whether plot applies? Well, we know it applies. It's the law of our circuit. Right, I mean. . . Do you concede that those violations need to be remanded and then either reviewed or dismissed as plot commands? The one deficiency does, yes. Okay. Okay. Okay. Anything further? I'm not sure I fully understand your response to Judge Christen's question. So they reported and they investigated, but they still got sanctioned for not reporting and not investigating. How does government justify that? They were also cited for failing to implement their own policies and procedures. And the issue there, again, is . . . I can understand getting cited for things they hadn't done. What I don't understand is getting cited in sanctions for things that they were in compliance with. What they weren't in compliance with, in part, was implementing their own policies and procedures, again, because they're laboring under an erroneous interpretation of what constitutes . . . All right, they hadn't done that, but they'd done the other things, and it looks from the record like you sanctioned them for it. But the obligation . . . Well, what's the government's interest in that? I don't get that. What is the government's interest in . . . What's the government's interest in sanctioning them for not reporting and not investigating when they had done that? It's not . . . There's also the quality of the investigation. The what? Well, I mean, it's not . . . Look, I'm sorry if you find these questions annoying, but I'm just looking for information. I don't mean to annoy you. Not at all. I apologize if I've come off as annoying. Your body language is so indicating. Let me ask it this way. Here's what I was trying to get at. Maybe I caused the problem by sending us down this road, but I don't think the per-day penalty was abated, was reduced at all between February and April, and I wonder if it shouldn't be. So if we have to remand this anyway on plot, should we ask that another look be taken at whether or not that was the appropriate per-day penalty between February and April? And if not, why not? I mean, I think it's the . . . I think that would be inherent in the remand for the ALJ to now look at the one remaining deficiency that wasn't reviewed, to look at the appropriateness of the continuing civil money penalty in light of the deficiencies which were found, plus the unreviewed deficiency. I mean, just so you're clear, it looks to us like you're piling on here and double punishing the facility for something that had been corrected, at least as to reporting and investigating by February. And to continue punishing them for that when they've done it seems to us wrong. I don't know how to say it any clearer than that. Certainly, and I take the Court's point. I would just reiterate that there is also, under the regulation that the facility was cited with at the revisit survey, the obligation to fully implement . . . Right. I understand. Your point is, until they got it and understood what abuse constitutes, how could they properly train their staff in the continuing care of the residents so that staff would understand that you can't do this in that situation? That's the basis for your continuing violation. That's not what we're concerned about. What we're concerned about is, by February, they'd investigated, they'd reported, they'd been punished for the period from December to February for that violation, but you kept punishing them. At the same rate. At the same rate. That just doesn't . . . that seems wrong. And I think that it would be within . . . since plot requires the remand on the unreviewed deficiency, and the issue there . . . The basis I understand plot is, because the unreviewed deficiencies theoretically could impact the amount of the CMP imposed, I think it would fall within the ALJ's discretion to look at . . . Let me suggest something. Have you two talked settlement? It sounds to me like you might be able, after we adjourn today, to sit down and talk with one another about perhaps resolving these unresolved issues so that we can put an end to this thing. On the unreviewed deficiencies? Yes. Yeah, yeah. I have not yet . . . the parties have not spoke about . . . Would you be willing to do that? I mean, we do have court mediators that are standing by who would be happy to facilitate that process, and if you're both willing to take a shot at that, we can certainly enter an order vacating submission so we don't issue a ruling to allow you guys to see if you can work it out. I mean, the government would be willing to discuss . . . To engage in those efforts? Yes, particularly on the . . . Are you client interested, or do you need to talk to . . . It's up to the authority. Sure. We're always interested. Most of these cases do so. Okay. Well, why don't you do this? Why don't you send us a letter within a week and let us know after you've had a chance to confer with your respective clients, and if you do wish to pursue mediation, we'll make a mediator either here in Pasadena or up in San Francisco available to assist you in that effort, and we won't issue anything for the next week until we hear from you. Okay? Thank you, Your Honor. All right. Do you want to say anything on rebuttal? Sure. I'll give you a couple of minutes. Thank you, Your Honor. Just two points very quickly. One is to address your point about the continuing. When the surveyors came back, the inspectors came back, they, of course, came back and recited a new deficiency that was based on this notion that this staff person had been convicted, which was not correct. So the ALJ sort of came up with a de novo rationale why the civil money penalty should continue, and parenthetically we're talking not just civil money penalty but denial of payment for new admissions for months at a time also. And his rationale was kind of crooked, and so the cock-eyed, not crooked crooked, that's a word unfortunately we're hearing. I didn't infer corruption. And so the board came up with this theory of its own that the reason was because we didn't understand what abuse really was or anything. But in fact, the board is more or less correct, and that is it's because we were disagreeing that this incident was abuse is why they reached that conclusion. So it really goes back, as you suggest, to the original deficiency basically continues because we disagreed with them. Right. And the risk, just so your clients understand, the risk that you're running with us is that we may very well have to rule as to whether or not the government's interpretation of abuse means what the government says it means. Of course. And applying Chevron deference whether or not the agency is entitled to take this broad definition of abuse. And that gets me to my second point, which is to address Judge Parker's hypothetical, and that really highlights the difficulty of applying this broad definition to every circumstance, particularly in a case where the staff thinks it's an emergency. And that's something we haven't really talked about, but I don't think anybody disputes, including the government, that the staff thought it was an emergency. After the fact, you know, there's assessment and analysis and second-guessing and so forth and so on. But I think we made the point in our brief real quickly that 99 out of 100 surveyors would have never cited this, and that's the APA problem here. How is a regulated entity supposed to figure out what the regulation means when it really comes down to second-guessing by a surveyor after the fact of what's in the staff's head? So our suggestion was that you can very easily apply the regulation if you use common-sense definitions of abuse to include one of, I think, three sort of overlapping factors. One is touching a resident, whether it's intended to control behavior or otherwise, either in a manner or in circumstances that has no legitimate clinical or therapeutic reason. This would catch the forcing somebody to take a bath case, which is sort of the second circumstance, and that is touching them in a way that's unreasonably intrusive or excessive under the circumstances. So they could have argued that here, but didn't really. Or third would be touching a resident when they refuse to be touched except in an emergency. But, you know, your offer is intriguing, but it's just quintessential rulemaking. I mean, we're not very good at that. Well, as I said, if we presume that most surveyors would not have cited this, then we have a problem. We're here because somebody did in a way that the staff didn't anticipate and couldn't anticipate. The only problem I'm having with your argument is that I counted ten surveyors, I think, on the visit in February, and then it got reviewed by an ALJ and then three members of the board and I don't know how many other people in the agency. It seems that there are a lot of people on the regulatory side who really think this is abuse. I think there were three surveyors at the original vote. Counselor, you've got another problem, which is that, I mean, if this were to go forward, the new definition, this Merrimack definition, was posted in the final rulemaking as of October 4th, 2016. The agency is getting ready to adopt this definition. So you're asking, this is a very heavy lift if you're asking us to impose a different rule, a different definition. Well, if it's something that happened several years ago under the regulation at the time. Chevron deference, right? Somebody has already jumped the gun and filed suit in the federal district court in Mississippi, so I don't think you're going to have to worry about that. Before you sit down, your time is just about up. But does the record reflect that there's any back story here? One of the readings of these records is that this seems to be lots and lots of substantial regulatory oversight for, I don't want to minimize it, but it's certainly not the worst problem we've ever seen. The back story. Does the record reflect that your client has some long history of noncompliance? No, this is actually a very good facility. Obviously, I don't want you to go outside of the record, but I just didn't understand. There was something about this that I just felt I didn't understand. Well, the question you ask is a good one, and the back story is that there is a lot of litigation over the question, what is abuse and what is reportable? And, I mean, I don't want to go too far outside the record either, but it usually comes up in the context of did the administrator properly decide that something should be treated like a grievance because there's also regulation that requires you to address grievances as opposed to an allegation of abuse. And so you have lots of second guessing that gets down to angels dancing on heads of pins as to what should the administrator have done in this circumstance versus that circumstance. And, frankly, Judge, that's probably why this case hasn't settled. I mean, there are lots of deficiencies get cited, lots of civil money penalties get imposed, and the vast majority of them get settled, but this one poses a question that's very important to caregivers, and that is can they get cited for abuse because a surveyor, whether it's 80% of the surveyors or 1 out of 1,000, has a different view of what they should have done than what they did in a circumstance that they thought was an emergency. And then, again, you get the cascade of, okay, well, if it was abuse, then you should have investigated, you should have suspended, you should have reversed. Well, actually, if it was an allegation of abuse, you should have investigated and reported. Right. And, you know, again, you have a broad rule, well, any time there's a broken finger, you should have taken that as an allegation. In this case, you had an administrator actually made a judgment and actually said, no, I don't think it falls into that category. And just one final comment to respond to your comment, Judge, that, right, surveyors cited, CMS imposed, somebody must have approved that, the ALJ, et cetera. But on the other hand, the administrator has an obligation to apply these regulations as well every day. And so does the state survey agency. And they reported these nurses and the nursing board said this is an abuse. And so then the state survey agency said, okay, we give, we'll say it's not abuse either. And so now you have conflicting definitions for this poor CNA who's trapped in the bathroom. All right. Thank you, counsel. The case just argued is submitted. And we'll enter an order vacating submission and wait to hear from either or both of you by letter to let us know whether to proceed with mediation. We will do that. Okay. Thank you both. Thank you both. All rise.
judges: Parker, Tallman, Christen